UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| UNITED STATES OF AMERICA, | Case No.: 2:17-cr-00267-APG-GWF |
|---|---|
| Plaintiff, | **FINDINGS AND RECOMMENDATION** |
| v. | Re: Motion to Suppress (ECF No. 45) |
| JOSE BUENROSTRO, | |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress Physical Evidence (ECF No. 45), filed on March 1, 2019. The Government filed its Response (ECF No. 57) on April 24, 2019, and Defendant filed his Reply (ECF No. 58) on May 1, 2019. The Court conducted an evidentiary hearing on May 29, 2019, during which Nevada Probation Officers Andrew Thompson, Andrew Wintersteen, and Christine MacDermaid, and former DEA Special Agent Sean Mabey testified.

**BACKGROUND**

Defendant Jose Buenrostro is charged in a two count indictment filed on August 16, 2017 with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and possession of a controlled substance with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii). *Indictment* (ECF No. 1). These charges arise out of the discovery of illegal controlled substances and firearms in Defendant's residence during a search conducted by officers of the Nevada Division of Parole and Probation on June 20, 2017.

Defendant argues that the search violated his rights under the Fourth Amendment and the evidence should be suppressed.

On October 29, 2014, Mr. Buenrostro was convicted in the Superior Court of Arizona, Yavapai County, of "Possession of Marijuana (Four Pounds or More)," a Class 4 felony. His sentence was suspended and he was placed on supervised probation for a period of forty months. *Government Hearing Exhibit 1*, at 004. Mr. Buenrostro applied to have his probation transferred to the State of Nevada where he intended to reside. On October 29, 2014, Mr. Buenrostro signed an "Offender's Application for Interstate Transfer," on a form adopted by the Interstate Commission for Adult Offender Supervision. *Id*. at 012. The application form stated in pertinent part:

> 2. I will comply with the terms and conditions of my supervision that have been placed on me, or that will be placed on me by Arizona (sending state) and Nevada (receiving state)
>
> 3. I understand that if I do not comply with all terms and conditions that the sending state or the receiving state, or both, placed on me, that it will be considered a violation and I may be returned to the sending state.

*Id.*

On October 29, 2014, Mr. Buenrostro also signed the Arizona Uniform Conditions of Supervised Probation which stated in pertinent part:

> 4. I will submit to search and seizure of person and property by the APD without a search warrant.
>
> . . .
>
> 7. I will provide APD safe, unrestricted access to my residence and receive prior approval of the APD before changing my residence. I will reside in a residence approved by the APD.

*Id.* at 001-003.

On January 21, 2015, Mr. Buenrostro signed the "Nevada Interstate Probation Agreement and Rules" form which included the following standard condition:

2

> 6. **Search:** You shall submit your person, property, place of residence, vehicle or areas under your control to search, including electronic surveillance or monitoring of your location at any time, with or without a search warrant or warrant of arrest, for evidence of a crime or violation of probation by the Division of Parole and Probation or its agent.

Under "**Special Conditions**," the agreement also provided:

> **1. Warrantless search of person, residence and/or property under subject's control[.]**

*Id.* at 013.

Mr. Buenrostro's application was granted and his probation supervision was assigned to Probation Officer Andrew Thompson. Officer Thompson testified that he is an interstate compact officer. His duties include completing paperwork on probationers who transfer to or from Nevada. He also supervises approximately one hundred probationers. Officer Thompson handled Mr. Buenrostro's transfer application and reviewed the conditions of probation with him at the outset of his probation in Nevada. He prepared an initial assessment of Mr. Buenrostro on February 3, 2015, and placed him on "medium level" supervision. *Government Hearing Exhibit 2*, at 263. He visited Mr. Buenrostro's residence approximately every five or six months. During those visits he conducted "walk-through" searches of the house, looking for any indication that Mr. Buenrostro was violating his probation conditions or engaging in illegal activity. During the walk-throughs, he would occasionally touch or move things, such as clothing in a closet. Officer Thompson understood that Mr. Buenrostro worked as an automobile mechanic and was paid "under the table." His wife worked a full time job. Officer Thompson viewed Mr. Buenrostro's employment situation as a minor violation of his probation conditions which require legal employment. On April 5, 2016, Officer Thompson performed a reassessment of Mr. Buenrostro's supervision and placed him on "minimum level" supervision. *Id*. at 254.

Mr. Buenrostro's supervision was transferred to Officer Andrew Wintersteen on May 3, 2016 due to officer caseload adjustments. *Government Hearing Exhibit 2*, at 253. On July 13, 2016, Officer Wintersteen received a voicemail message from a DEA agent regarding Mr. Buenrostro. Officer Wintersteen made telephone contact with DEA Agent Sean Mabey on July

27, 2016. According to Officer Wintergreen's note, Agent Mabey stated that he had received notification from the Las Vegas Metropolitan Police Department that Mr. Buenrostro was involved in a heroin smuggling ring, and was transporting heroin from Phoenix, Arizona to Las Vegas, Nevada. Mr. Buenrostro's cousin took the heroin sales proceeds to Mexico. Agent Mabey stated that he would get back in touch with Officer Wintersteen in August to provide a status on the investigation. *Id.* at 250. Officer Wintersteen testified that he took no action in response to this information because he did not want to "interrupt" the DEA investigation. He believed he would have informed his supervisor about this information, but did not enter a Chrono note to that effect.

On August, 5, September 7, and October 7, 2016, Mr. Buenrostro reported to Officer Wintersteen that he was a self-employed automobile mechanic and was paid in cash. He also provided a bank statement as verification of his employment. *Government Hearing Exhibit 2*, at 246, 248, and 249. During a home visit on October 13, 2016, Officer Wintersteen observed Mr. Buenrostro and a friend working on vehicles in the garage and observed that vehicle parts were everywhere. He also conducted a "cursory search" of the residence. Officer Wintergreen defined a cursory search as a "walk around" of the residence, during which he looks for violations in plain view, and observes the demeanor and behavior of the residents. He does not conduct a cursory search unless the probationer is present. Officer Wintersteen informed Mr. Buenrostro on October 13, 2016 that his supervision was being transferred back to Officer Thompson. *Id.* at 246. He believed he would have informed Officer Thompson about the information he received from DEA Agent Mabey in July 2016, but did not have a specific recollection of doing so.

Officer Thompson testified that Officer Wintersteen informed him about the information provided by DEA Agent Mabey when he reassumed Mr. Buenrostro's supervision. On November 30, 2016, Officer Thompson completed a reassessment of Mr. Buenrostro and placed him "in minimum supervision as no issues had [arisen] thus far." *Id.* at 245. He noted in March and April 2017 that Mr. Buenrostro was working at a sandwich shop. *Id.* at 242.

On May 9, 2017, Officer Thompson received a voicemail message from Agent Mabey which stated that Mr. Buenrostro was continuing to sell heroin. Officer Thompson called Agent Mabey back and left a return message. *Id*. at 241. He did not recall whether he actually spoke to Agent Mabey. Officer Thompson was aware that Mr. Buenrostro had been given permission to travel to Arizona in March 2016, and at the end of April/beginning of May 2017. *See also Government Hearing Exhibit 3* (travel authorizations). After receiving the voicemail message from Agent Mabey, Officer Thompson told his sergeant that Mr. Buenrostro might need a closer level of supervision. This would involve assigning him to a "risk assessment" officer who had a lower caseload and could perform more in-depth investigations. On May 25, 2017, Officer Thompson conducted a home visit, during which he met with Mr. Buenrostro and reviewed the conditions of supervision. He did not inform Defendant that he was being assigned to a new probation officer. *Government Hearing Exhibit 2*, at 240.

On May 25, 2017, Probation Officer Christine MacDermaid spoke with Mr. Buenrostro by telephone and informed him that she was his new probation officer. She instructed him to report to the probation office on June 5, 2017. During this conversation, Mr. Buenrostro stated that he worked as an independent contractor. *Id.* at 240. On May 30, 2017, Probation Officers MacDermaid and Hillyer conducted a visit at Mr. Buenrostro's residence. They observed Mr. Buenrostro and another male working on an automobile. The other individual provided identification, and after Officer MacDermaid determined that he had no warrants, wants or felony record, he was allowed to leave. Officer MacDermaid's note states that the officers conducted a "[c]ursory search" of the residence during which Officer MacDermaid "noted a large folded stack of 100 $ bills in the top right dresser drawer [that] was partially opened and just thrown in there." She also "noted a folded stack of 20 $ bills folded in the top nightstand drawer sticking out." The note indicates that Officer MacDermaid forwarded this information to DEA Agent Mabey. *Id.* at 240.

Agent MacDermaid met with Mr. Buenrostro on June 5, 2017. She noted that he did not provide proof of employment, and had not completed a "10-99" form. Mr. Buenrostro stated that he was a self-employed mechanic. He paid $120.00 on his probation fees that day. He reported

that he owned three automobiles, a 1988 Ford Mustang, a 2006 Dodge Durango, and a 2004 Nissan Titan. *Id. at 239.*

On June 20, 2017, Officer MacDermaid and other probation officers conducted the search of Mr. Buenrostro's residence during which they discovered firearms, methamphetamine, and marijuana. The officers contacted Las Vegas Metropolitan Police Officers who obtained a telephone search warrant to further search the residence. After being advised of his *Miranda* rights, Mr. Buenrostro allegedly admitted to the police that the firearms and illegal drugs found in the residence belonged to him. *Id*. at 239.

Former DEA Special Agent Sean Mabey testified that he began an investigation of Mr. Buenrostro in May of 2016 after he received a telephone call from a former DEA confidential source of information who stated that Mr. Buenrostro was involved in narcotics trafficking. Agent Mabey had not previously dealt with this confidential source who was located in Mexico. He reviewed the DEA file on the confidential source and spoke with other DEA agents who had worked with him.[1] The information indicated that the confidential source had provided reliable information in two prior cases that resulted in the seizure of drugs and successful prosecution. There was no derogatory information about the confidential source in the file, and the other DEA agents vouched for him. Agent Mabey did not know if the confidential source had a criminal record. He believed that he had been paid for information, but did not know if he provided information in exchange for favorable treatment on criminal charges.

The confidential source told Agent Mabey that an individual named Jose was involved in trafficking heroin, methamphetamine and cocaine from Phoenix to Las Vegas; and that Jose's cousin, whose last name was Ortiz, took the sales proceeds to Mexico. The confidential source stated that he had purchased crystal methamphetamine from Jose at his Las Vegas automobile repair shop in 2013 and he provided Jose's telephone number. Agent Mabey determined through subpoenas that the Mr. Buenrostro was the subscriber for that telephone number. He sent a photograph of Mr. Buenrostro by text message to the confidential source who confirmed that it

---

[1] Agent Mabey did not state whether the confidential source was male or female. The male designation is used solely for ease of reference.

6

was Jose. The confidential source stated that Jose was "under house arrest for a prior offense." Agent Mabey ran a criminal records check on Mr. Buenrostro through NCIS and other law enforcement data bases, and determined that he was on probation with the State of Nevada. He then reached out to Nevada Parole and Probation to advise that he had information that Mr. Buenrostro was involved in drug trafficking.

The confidential source later reported to Agent Mabey that he spoke to Mr. Buenrostro in September 2016 about purchasing crystal methamphetamine. Mr. Buenrostro told the confidential source that he was not able to sell crystal methamphetamine at that time, and indicated that he was waiting on "powder." A state court pen register and trap and trace order was obtained on Mr. Buenrostro's telephone number. It did not produce any additional information that Mr. Buenrostro was engaged in illegal activity.

Agent Mabey closed the investigation of Mr. Buenrostro in February 2017 because he had lost contact with the confidential source and had not developed other evidence of criminal activity by Mr. Buenrostro. Approximately three months later, Agent Mabey received a telephone call from the confidential source who stated that Mr. Buenrostro was still engaged in narcotics trafficking. Agent Mabey stated that this conversation was brief and that he was surprised to receive the call. Agent Mabey spoke to Nevada Parole and Probation Officer MacDermaid and informed her that he had received information that Mr. Buenrostro was still involved in illegal activity. Officer MacDermaid subsequently called him on June 20, 2017 about the search of Mr. Buenrostro's residence. Agent Mabey went to the residence, but was not involved in the investigation.

Officer MacDermaid testified that she is assigned to an intensive supervision unit that supervises probationers or parolees who have an extensive criminal history, violent offenses, gang ties, or otherwise require more supervision. Supervision of Mr. Buenrostro was transferred to her on May 25, 2017 after Parole and Probation received information from Agent Mabey that Mr. Buenrostro was involved in narcotics trafficking. Officer MacDermaid telephoned Mr. Buenrostro and informed him that she was now his probation officer. She reviewed Mr. Buenrostro's file and the Chrono notes in the file. Officer MacDermaid stated that tip

1    information that Mr. Buenrostro was engaged in narcotics trafficking, and his underlying

2    conviction for trafficking a large quantity of drugs, was of concern to her.  On cross-

3    examination, Agent MacDermaid acknowledged that Defendant's conviction was for possession

4    of marijuana, not drug trafficking.  She also noted that Mr. Buenrostro stated that he was a self-

5    employed mechanic, but there was no verification of his employment or how he was bringing

6    money into the household.  He had a house and owned several cars which, in her opinion, did not

7    correspond with the lack of verified employment.  (Mr. Buenrostro's wife was employed full

8    time.)  Mr. Buenrostro did not have a business license or a 1099 form.  He reported that he

9    worked for cash and did not pay taxes.  Officer MacDermaid believed that Mr. Buenrostro's

10   previous probation officers should not have overlooked the unlawful status of his employment.

11          Officer MacDermaid testified that she spoke directly to Agent Mabey who told her that

12   an informant in Mexico reported that Mr. Buenrostro was bringing large amounts of heroin

13   across state lines.  She had also reviewed Officer Wintersteen's notes regarding the earlier

14   information received from Agent Mabey.  She believed that Mr. Buenrostro's travel passes to

15   Arizona corresponded to the tip information.  During the walk-through inspection on May 30,

16   2017, she observed a large amount of money in a bedroom dresser drawer and in a nightstand

17   drawer that were partially opened.  She believed that the presence of the money was consistent

18   with the information that Mr. Buenrostro was engaged in heroin smuggling.   Her follow-up

19   meeting with Mr. Buenrostro on June 5, 2017 supported her suspicion that he was engaged in

20   illegal activity because he stated that he was not reporting his income from working as a

21   mechanic to the IRS.  He also made a large payment on his supervision fees that day which she

22   found suspicious.  She also found it suspicious that Mr. Buenrostro owned three automobiles that

23   she believed were insured.

24          Agent MacDermaid testified that she decided to conduct the probation search on June 20,

25   2017 based on the following information: (1) the tips from DEA Agent Mabey; (2) the large

26   amount of money observed in Mr. Buenrostro's residence on May 30, 2017; (3) Mr.

27   Buenrostro's inability to demonstrate lawful employment; and (4) being behind on his

28   supervision fees.  During the search by the probation officers on June 20th, a firearm was

1   discovered in a spare bedroom.  Once the firearm was discovered the officers placed Mr.
2   Buenrostro in handcuffs and read him his *Miranda* rights.  Agent MacDermaid then contacted
3   Agent Mabey and notified him that she needed assistance to search the residence.  She also
4   contacted the Las Vegas Metropolitan Police Department (LVMPD) for assistance.  LVMPD
5   officers responded to the scene.  The other probation officers continued to search and found
6   methamphetamine and an additional firearm in the residence.  Large quantities of cash were also
7   found in the same locations where Officer MacDermaid had observed cash during the walk-
8   through on May 30, 2017.

## DISCUSSION

The testimony of Officers Thompson, Wintersteen, MacDermaid, and Agent Mabey was generally credible in regard to the factual information they conveyed.  Some doubt is raised by Officer MacDermaid's and Agent Mabey's failure to document in writing the conversation that they had in May 2017 regarding the information provided by the confidential source.  Agent Mabey also failed to document the telephone call he received from the confidential source at about that time.  Officer Thompson, however, documented the voicemail message that Agent Mabey left with him on May 9, 2017 that the Defendant was continuing to sell drugs.  The Court accepts the testimony that Agent Mabey spoke to the confidential source in or about early May 2017 and that he communicated this information to Officer MacDermaid prior to May 30, 2017.

The Fourth Amendment states that the "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  "A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'"  *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168 (1987).  Although a warrant supported by probable cause is usually required by the Fourth Amendment, "exceptions to these requirements have been permitted when 'special needs, beyond the normal need for law enforcement, make the warrant, and probable-cause requirement impractical.'"  *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 748 (1985)).  The Court held

that a state probation system presents "special needs" that may justify departures from the usual warrant and probable-cause requirements. *Id.*, 483 U.S. at 873-74, 107 S.Ct. at 3168. Probationers "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Id.*, 483 U.S. at 874, 107 S.Ct. at 3169. Probation restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer being at large. *Id.*, 483 U.S. at 875, 107 S.Ct. at 3169.

In *Griffin*, the probation office received a tip from a police detective that there were, or might be, firearms in the probationer's residence. *Id.*, 483 U.S. at 871, 107 S.Ct. at 3167. A state regulation permitted a probationer's home to be searched without a warrant so long as there were reasonable grounds to believe that contraband, including items that the probationer was not allowed to possess, were located in the residence. Acting on the police tip, the probation officers searched Griffin's residence and found a handgun. The Wisconsin Supreme Court held that the tip constituted reasonable grounds for the search pursuant to the regulation. *Id.*, 483 U.S. at 874, 107 S.Ct. at 3169. The Supreme Court held that the special needs of Wisconsin's probation system made the warrant requirement impractical and justified replacing the requirement for probable cause with reasonable grounds as defined by the Wisconsin Supreme Court. *Id.*, 483 U.S. at 875-76, 107 S.Ct. at 3169-70. In holding that the search of Griffin's home did not violate the Fourth Amendment, the Court stated:

> In such circumstances it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases—especially those involving drugs or illegal weapons—the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.
>
> To allow adequate play for such factors, we think it reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search. The same conclusion is

10

> suggested by the fact that the police may be unwilling to disclose their confidential sources to probation personnel. For the same reason, and also because it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, we think it enough if the information provided indicates, as it did here, only the likelihood ("had or might have guns") of facts justifying the search.
>
> The search of Griffin's residence was "reasonable" within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers. This conclusion makes it unnecessary to consider whether, as the court below held and the State urges, *any* search of a probationer's home by a probation officer is lawful when there are "reasonable grounds" to believe contraband is present.

*Id.*, 483 U.S. at 879-80, 107 S.Ct. at 3170-71.

In *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587 (2001), the Court held that a search pursuant to a probation search condition may be conducted for the purpose of obtaining evidence of criminal activity, rather than solely for purposes of probation supervision. In describing the purposes of probation, the Court stated that "[o]n the one hand is the hope that [the probationer] will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community." *Id.*, 534 U.S. at 120-21, 122 S.Ct. at 592. Therefore, "when an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal activity is occurring that an intrusion on the probationer's significantly diminished privacy interest is reasonable." *Id.*, 534 U.S. at 121, 122 S.Ct. at 593.

Reasonable suspicion to conduct a probation search exists when the officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion. *United States v. Manansingh*, 281 F.Supp.3d 1096, 1099 (D. Nev. 2017) (citing *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). The standard for determining whether there is reasonable suspicion is an objective one. It does not turn on the subjective thoughts of the probation officer *Id.* at 1100 (citing *United States v. Magallon–Lopez*, 817 F.3d 671, 675 (9th Cir. 2016). However, the facts justifying the search must be known to officers at the time of the search. *Id.*

11

In *Himmage v. State*, 88 Nev. 296, 496 P.2d 763 (1972), the parole officer received a tip from the police that defendant had stolen property in his apartment. The parole officer and police officers searched defendant's residence and found the stolen property. In upholding the search, the court relied on *People v. Mason*, 5 Cal.3d 759, 97 Cal.Rptr. 302, 488 P.2d 630 (Cal. 1971), *cert. denied* 405 U.S. 1016, 92 S.Ct. 1289 (1972), which involved almost identical facts, except that the defendant was on probation. *Mason* stated that a "probationer who has been granted the privilege of probation on condition that he submit at any time to a warrantless search may have no reasonable expectation of traditional Fourth Amendment protection." The Nevada Court approved the reasoning in *Mason*, and held that the search of defendant's residence pursuant to the provision in his parole agreement did not violate the Fourth Amendment. *Himmage*, 496 P.2d at 765-66.

In *Seim v. State*, 95 Nev. 89, 590 P.2d 1152, 1154 (1979), the court upheld the search of the probationer's storage unit based on an informant's tip that stolen vehicles were located there. The court noted that Nevada Revised Statue (NRS) 213.1096 empowers parole and probation officers to "keep informed concerning the conduct and condition of all persons under their supervision and use all suitable methods to aid and encourage them . . . to bring about improvement in their conduct and conditions." 590 P.2d at 1154. The court stated that "[i]n Nevada, as elsewhere, probation officers have long enjoyed extensive powers to search probationers under their supervision." *Id.* (citations omitted). "To justify a warrantless search by a parole or probation officer, the officer must have reasonable grounds to believe that a violation of the parole or probation has occurred." *Id.* at 1154-55.

In *Samson v. California*, 547 U.S. 843, 850, 857, 126 S.Ct. 2193 (2006), the Supreme Court held that the search of a parolee's person pursuant to a state law that authorized searches of parolees without a search warrant and without reasonable cause did not violate the Fourth Amendment. The Court noted that parolees have a lesser expectation of privacy than do probationers. In *United States v. King*, 736 F.3d 805, 810 (9th Cir. 2013), the court held that a suspicionless search conducted pursuant to a suspicionless-search condition in a violent felon's probation agreement did not violate the Fourth Amendment. The Court did not reach the issue of

whether the Fourth Amendment permits the suspicionless search of a probationer who has not accepted a suspicionless search condition, or of lower level offenders who have accepted a suspicionless-search conditions. *Id.* The dissent argued that the search condition did not explicitly state that a search could be conducted without reasonable suspicion (it only stated that probable cause was not required), and therefore the evidence should have been suppressed. In *United States v. Gomez*, 2014 WL 1089288 (N.D.Cal. March 14, 2014), the court held that the probationer could not be subjected to a suspicionless search because the search provision in his conditions of probation did not include suspicionless-search language, and the probationer was not a violent felon. *Id.* at *14. *See also United States v. Craft*, 2017 WL 4948998, at *2 (N.D.Cal. Nov. 1, 2017) (holding that reasonable suspicion is required if the search provision does not expressly authorize a suspicionless search).

In this case, the search conditions imposed on Defendant Buenrostro by the Arizona Superior Court and by the State of Nevada pursuant to the Interstate Compact Transfer did not expressly state that he was subject to a suspicionless search of his person, residence or vehicles. Defendant was on probation for a felony conviction for possession of four pounds of marijuana or more. Although his prior criminal record listed arrests for murder and domestic abuse, there was no evidence that Defendant was ever convicted of a violent felony. *See Government Hearing Exhibit 10.* The Nevada Supreme Court's decision in *Seim* states that the Nevada probation officers must have reasonable suspicion to search a probationer's person, residence or other property. In accordance with *Knights, King* and *Gomez*, the Court concludes that under the Fourth Amendment, reasonable suspicion was also required to search Defendant's residence for evidence that he violated his probation conditions or had engaged in criminal activity.

Courts have held that probation officers may conduct a home visit and walk-through inspection of a probationer's residence without reasonable suspicion that the probationer has violated his probation conditions or engaged in criminal activity. In *United States v. LeBlanc*, 490 F.3d 361 (5th Cir. 2007), the probation officer conducted a walk-through inspection of defendant's residence during which he observed the barrel of a shotgun protruding from underneath defendant's bed. The court stated:

> While this Circuit has not yet considered the question, other Circuits in similar cases have held that a probation officer properly conducting an authorized home visit was not bound by the reasonable suspicion standard. The Second Circuit has held that "because home visits 'at any time' are conducted pursuant to a *court-imposed condition* of federal supervised release of which the supervisee is aware, and because a home visit is far less intrusive than a *probation search,* probation officers conducting a *home visit* are not subject to the reasonable suspicion standard applicable to *probation searches* under Knights." United States v. Reyes, 283 F.3d 446, 462 (2d Cir.2002) (emphasis in original). The court reasoned that home visits as a condition of probation in the absence of reasonable suspicion were justified because of the need of the state to exercise supervision over probationers, ensuring that they comply with the conditions of probation and do not return to a life of crime. *Id.* at 461.

490 F.3d at 376.

In *United States v. Hedrick*, 146 Fed.Appx. 871, 872 (9th Cir. Aug. 25, 2005) (unpublished memorandum), the court also held that probation officers are not required to have reasonable suspicion to conduct authorized home visits. The court stated:

> Hedrick did not have a reasonable expectation of privacy with respect to the home visit because (1) he was informed in his post-prison supervision agreement that probation officers would conduct home visits, see United States v. Kincade, 379 F.3d 813, 827-28 (9th Cir.2004) (en banc); (2) probationers enjoy only conditional liberty, see Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), United States v. Harper, 928 F.2d 894, 896 & n. 1 (9th Cir.1991); (3) any such expectation of privacy is not one that society recognizes as reasonable, see United States v. Knights, 534 U.S. 112, 119-20, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); and (4) one of the primary tasks of a probation officer is to determine the conditions and circumstances of the probationer's living arrangements and probationers are well aware of that verity. See also Latta v. Fitzharris, 521 F.2d 246, 249-50 (9th Cir.1975) (en banc); United States v. Reyes, 283 F.3d 446 (2d Cir.2002). Since the inception of the probation and parole systems, probationers and parolees have understood that they are subject to home visits from time to time by their probation and parole officers. Hedrick could not reasonably have had any other expectation. Thus, individualized suspicion was not required.

*See also United States v. Tessier*, 814 F.3d 432, 434 (6th Cir. 2016) (noting that courts uphold less invasive "home visits" where there is no reasonable suspicion).

The Nevada Interstate Probation Agreement and Rules that Defendant Buenrostro signed on January 21, 2015 did not contain an express provision that probation officers would conduct home visits at Mr. Buenrostro's residence. The Arizona Uniform Conditions of Supervised

Probation that Defendant signed on October 29, 2014 stated, however, that Defendant would provide the Arizona Probation Department with unrestricted access to his residence. The application for Interstate Transfer that Defendant signed that same day stated that he would comply with the terms and conditions of supervision that were placed on him by Arizona and Nevada. Although it would have been preferable if the home visit condition had also been expressly included in the Nevada Interstate Probation Agreement and Rules, Defendant was reasonably notified that he was subject to home visits pursuant to the Arizona probation conditions that he agreed to be bound by during his probation supervision in Nevada.

Officers Thompson and Wintersteen conducted several home visits and walk-through inspections ("cursory searches") during their supervision of Defendant. None of those inspections or searches resulted in the discovery of evidence of probation violations or criminal activity. On May 30, 2017, Officers MacDermaid and Hillyer conducted another home visit and walk-through inspection of Mr. Buenrostro's residence. At the time of that visit, Officer MacDermaid was aware of the recent report from DEA Special Agent Mabey that Defendant was still selling heroin. Officer MacDermaid was also aware that Defendant was on probation for a felony conviction for possession of four pounds or more of marijuana. These circumstances arguably provided the officers with reasonable suspicion to believe that Defendant was violating his probation conditions or engaging in criminal activity. *Griffin v. Wisconsin, supra*. Thus, even if the home visit/walk-through inspection was not authorized because it was not an express condition of Defendant's probation supervision in Nevada, it could be justified as a probation search based on reasonable suspicion.

During the walk-through inspection, Officer MacDermaid observed a folded stack of one hundred dollar bills in a dresser drawer that was partially opened, and a folded stack of twenty dollar bills in a nightstand drawer that was "sticking out." Defendant argues that the presence of this currency was consistent with the cash payments he earned as an automobile mechanic. That is a plausible explanation, but not one that Officer MacDermaid was required to believe. Defendant acknowledged that he was not paying taxes on the money he earned as a mechanic. There was no information as to how much mechanic work he actually performed or the amount

of income he earned from that work. The presence of large amounts of currency in a suspected narcotics trafficker's residence is consistent with suspected criminal activity. The fact that there are innocent explanations for particular circumstances does not require that the officers ignore the reasonable inferences that may be drawn from those circumstances. *See e.g. Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 676-77 (2000) (flight from the police may have innocent explanations, but it is an indication of criminal activity).

In *United States v. Williams*, 880 F.3d 713 (5th Cir. 2018), the defendant was on probation for a conviction for distributing marijuana. The defendant had been a model probationer, and the probation officer was preparing a request to terminate his probation when he received a tip from the DEA that defendant was trafficking large amounts of heroin. The probation officer went to the car dealership where defendant worked and observed large bulges underneath his clothing. The officer conducted a pat-down search which resulted in the discovery of large amounts of cash. The defendant stated that the money was the proceeds of car sales. The probation officers proceeded to search defendant's residence where substantial additional quantities of currency were found, as well as a firearm. In holding that the search of defendant's residence was supported by reasonable suspicion, the court stated:

> The Supreme Court specifically acknowledged in *Griffin* that tips given to a probation officer from other law enforcement officers are sufficient to support reasonable suspicion to conduct a search of a probationer. *See* 483 U.S. at 879–80, 107 S.Ct. 3164 (observing that it is "reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search"). Additionally, as the Court further observed in *Griffin*, in deciding whether to conduct a search of a probationer, the probation officer "must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances." *Id*. at 879, 107 S.Ct. 3164. Here, Officer Green provided a number of factors he considered based on his experience with Williams that would support reasonable suspicion to conduct a search once he received the tip from state and federal law enforcement. Specifically, Officer Green testified:
>
>> So in my mental checklist ... he's on [probation] for distributing drugs. DEA is telling me he's probably distributing drugs or that they think he is. But I'm still trying to give him the benefit of the doubt. He's got multiple previous convictions for distributing drugs. He lives in a fortress. I mean, his house is built like a fortress. You can't get in

16

> without going through the [four large pit bulls] or somebody letting you in. So I need to look into this. On face value, this is not looking good.
>
> The tip, these factors, and Officer Green's past experience with Williams were sufficient to support Officer Green's decision to conduct a search of Williams's residence.

880 F.3d at 720.

In this case, the Nevada Parole and Probation Officers received information from DEA Agent Mabey in July 2016 that Defendant Buenrostro was engaged in heroin smuggling or trafficking, and was transporting heroin from Phoenix to Las Vegas. The officers were also aware that the Defendant made authorized trips to Tucson, Arizona in March 2016, and later in April/May 2017 which could correspond to Defendant's alleged narcotics trafficking. The probation officers did not take action after Agent Mabey's initial tip in July 2016, but Officer Wintersteen explained that he did not want to interrupt the DEA investigation.

Officer MacDermaid testified that the decision to search Defendant's residence was based on (1) the information provided by DEA Agent Mabey; (2) the large amount of money observed in Mr. Buenrostro's residence on May 30, 2017; (3) Mr. Buenrostro's inability to demonstrate lawful employment; and (4) being behind on his supervision fees. Defendant argues that the information that Agent Mabey received from the informant was unreliable. Under *Griffin*, however, the probation officers were entitled to rely on Agent Mabey's tip without inquiring into its underlying basis. Of course, if the probation officers knew that the information on which the tip was based was unreliable, then it would not have been objectively reasonable for them to rely on the tip.

Officer MacDermaid was aware from her conversation with Agent Mabey that a confidential source provided the information that Mr. Buenrostro was smuggling heroin. There is no evidence that she was familiar with the details of the DEA investigation or the reliability of the confidential source. That said, the confidential source's tip appeared generally reliable. He had provided reliable information in other investigations. He stated that he purchased drugs from Jose a few years earlier, and had recently spoken to him about purchasing narcotics. The confidential source positively identified a picture of Mr. Buenrostro as Jose. Defendant's

argument that the tip was stale, is overcome by the fact that the confidential source told Agent Mabey in early May 2017 that Defendant was continuing to sale heroin, and Agent Mabey reported that information to the probation officers.

## CONCLUSION

The home visit/walk-through that Officers MacDermaid and Hillyer conducted on May 30, 2017 did not violate the Fourth Amendment because it was authorized by Defendant's Arizona probation conditions which he was also bound by while under supervision in Nevada. Officer MacDermaid's observation of large amounts of currency in plain view in Defendant's bedroom, combined with the Agent Mabey's tips that Defendant was engaged in the smuggling of heroin, provided reasonable suspicion to support the probation search on June 20, 2017. Accordingly,

## RECOMMENDATON

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Physical Evidence (ECF No. 45) be **denied.**

DATED this 14th day of June, 2019.

_____
**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).